IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 24, 2021 Session

**STATE OF TENNESSEE v. EDWARD EARL KILLGO**

**Appeal from the Criminal Court for Knox County
No. 115170   G. Scott Green, Judge**

_____

**No. E2020-00996-CCA-R3-CD**

_____

The Appellant, Edward Earl Killgo, pled guilty in the Knox County Criminal Court to statutory rape, a Class E felony.  Pursuant to the plea agreement, he received a six-year sentence as a Range III, persistent offender with the trial court to determine the manner of service of the sentence, including his request for judicial diversion, and whether he would be placed on the sex offender registry.  After a sentencing hearing, the trial court ordered that the Appellant be given credit for time served in jail, that he serve the balance of his six-year sentence on supervised probation, and that he be placed on the sex offender registry.  On appeal, the Appellant claims that the trial court erred by denying diversion and by ordering that he register as a sex offender.  Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court erred.  Therefore, we reverse the trial court's denying judicial diversion and ordering that the Appellant be placed on the sex offender registry and remand the case for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed,
Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JILL BARTEE AYERS, J., joined.  ROBERT H. MONTGOMERY, JR., J., concurring in results only.

Jonathan Harwell (on appeal), Knoxville, Tennessee, and Adam Elrod and Melissa Dirado (at hearings), Maryville, Tennessee, for the appellant, Edward Earl Killgo.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Charme P. Allen, District Attorney General; and Sarah Keith, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# I. Factual Background

On March 19, 2019, the Appellant was charged by presentment with two counts of rape based upon alternative theories. On April 24, 2020, the grand jury amended the presentment to add a charge of statutory rape. That same day, the Appellant pled guilty to statutory rape, a Class E felony, and the State dismissed the rape charges. Pursuant to the plea agreement, the Appellant was to receive a six-year, out-of-range sentence as a Range III, persistent offender with the trial court to consider the manner of service of the sentence and his application for judicial diversion. The trial court also was to determine whether the Appellant would be placed on the sex offender registry.

At the guilty plea hearing, the State advised the trial court, "I do want to note for the record that this is a negotiated settlement as a result of facts and circumstances surrounding this case where each side has a number of favorable and unfavorable facts making a settlement short of trial acceptable to both parties." The State then presented the following factual account of the crime:

> The defendant's date of birth is 7-10-94. The [victim's] date of birth is 4-18-02. On July 5th, 2018 at approximately 3:08 a.m., deputies and a detective from the Knox County Sheriff's Office responded to [a home on] Andies Road in response to a rape report, that it occurred [in a home on] Chert Pitt Road.
>
> A detective Matt Lawson responded and then went to Children's Hospital where the victim was at that point to get her statement and continue the investigation.
>
> The suspect was identified as Edward Earl Killgo. The victim submitted to a SANE exam and swabs were taken and sent to TBI for testing. Additional search warrants were executed to get buccal swabs and further investigation for comparison.
>
> Investigation revealed that the victim was friends with the defendant's sister and they had been hanging out on the 4th of July. He eventually picked the two of them up and they then hung out all day. They had driven around, they had gone to several places, including West Town Mall.
>
> Through the course of the day, starting at least seven p.m., they consumed strawberry drinks, other alcoholic beverages and were smoking marijuana.
>
> They had gone back and forth between other places, her friend's house and her house, ending up at her house and having a bonfire. At about two

a.m. on July 5th the victim believed that she had left her phone at her friend's house where the defendant also lived, being the brother.

So she went back to that house to try to locate her cell phone. The houses are about, according to the victim, three houses down from each other, close enough in proximity to walk. The defendant answered the door. She looked for her phone, asked to use the bathroom. From there, she went downstairs to the bathroom. He started, the defendant, knocking on the door. Opened the door and asked if she was okay. She said she was okay but was frustrated because she couldn't find her cell phone.

She said she needed to wash her face and go on. He hugged her and held her and she said she needed to go home. At that point she says the next thing she remembers he was on top of her. She was not completely conscious at that point. She did describe vaginal penetration with the defendant's penis. She remembers him asking if she knew what she was doing, if she was okay, and if she wanted him to stop. She says she felt like she was paralyzed, couldn't move or speak, but does recall that she laid there crying.

He got up and splashed water on her face. She told him to get out and shut the door. At that point she got dressed again and came out of the bathroom. The defendant was standing outside smoking a cigarette at that point. She ran back to her house and reported to her friends what had happened. They called the police and from there the investigation began.

They described her demeanor at that point as being extremely upset. She had injured her foot at some point and it was bleeding, possibly on the run back from Mr. Killgo's residence.

The SANE exam revealed that there was vaginal swelling and bleeding. They could not determine where that bleeding was actually from. The victim identified a photo of the defendant as the person who had assaulted her. Officers attempted to locate and interview the defendant at that point, but they were unable to do that. He was eventually picked up on this case, the NIA capias, in Florida.

In the meantime, the samples and everything had been submitted to the Tennessee Bureau of Investigation for serology DNA analysis. A full DNA profile was obtained on the victim and a DNA profile of an unidentified male sperm fraction was identified on the external vaginal swab. At that point the sample was compared to the CODIS database where it was determined that they had a preliminary match to an individual named Edward Earl Killgo.

Once the defendant came back into custody, Detective Lawson executed a new search warrant to get buccal swabs from the suspect to compare to the profile, but TBI was able to identify from the same sample of the external vaginal swab. Eventual testing done by the TBI confirmed that Edward Killgo was the owner of the DNA sperm fraction that was found on the victim's external vaginal swab. These events did occur in Knox County, Tennessee.

After the State's recitation of the facts, the trial court asked if defense counsel had anything to add, and defense counsel responded,

Judge, just the things that we want to make sure are clear, and obviously as [the State] said, this has been several months of us sort of trying to parse this out. [The victim] gave I think three different statements over the course of this investigation. The details of which were inconsistent at times, including statements given to the medical professionals that were provided in discovery via her records. All of the parties involved were drinking and smoking pot the night that this happened.

Additionally, after [the victim] goes back to her house and alerts her siblings and the other people that were still at the party, there's at least two boys that come to the house where Mr. Killgo is at armed with weapons. There was a KCSO officer who actually got a call to show up because there were boys walking around the roads with a baseball bat.

And I think the thing that -- it should be clear, but just to make sure it is, [the victim] left the party to go over to Mr. Killgo's house at about 2:30, 3:00 in the morning.

The trial court stated that it would "accept all of the facts as far as the stipulated proof in this record" and that "[o]bviously, there's a lot of moving parts here, it probably was a wise choice on both of your parts to resolve the case." The trial court accepted the Appellant's guilty plea to statutory rape.

On July 10, 2020, the trial court held a sentencing hearing to consider the Appellant's requests for judicial diversion and full probation and whether he would be placed on the sex offender registry. At the outset of the hearing, the State advised the trial court that the victim was present but that the State was going to read her victim impact statement and introduce it into evidence as an exhibit.[1] The State also advised the trial

---

[1] We note that the victim impact statement was prepared the day before the sentencing hearing. The Appellant did not object to the timeliness of the statement. In his reply brief, the Appellant argues for

court that it was going to introduce the Appellant's presentence report and psychosexual evaluation into evidence as separate exhibits.

Regarding the victim impact statement, the State advised the trial court that the statement was "written in response to the inquiry from the probation office" and that "I'll be reading the headings that prompted her response on each of those." The State then proceeded to read eighteen questions and the victim's answers to those questions. The first question asked the victim to describe the incident. The victim responded that on July 4, 2018, the Appellant "attacked" her when she went to his house to look for her telephone and use the restroom. The State then read as follows:

> I walked down to my friend's room and then went to her bathroom. When I opened the door, [the Appellant] was laying against the wall and told me I needed to calm down. He went to give me a hug and the next thing I remember was being on the floor and feeling his weight on top of me. When I tried to move and scream, nothing came out of my mouth and I couldn't move a muscle.
>
> I remember just crying and wishing I was anywhere but laying naked on that bathroom floor with only the shoes on my feet. I was in and out of consciousness and remember waking up choking on water and not being able to breathe without inhaling a bunch of water.
>
> I didn't know what was happening and I remember feeling terrified, angry, scared, and paralyzed. When I came to, I realized I needed to think fast and get out of there. I got all of my energy and strength together and I pushed him off of me. He kept trying to talk to me and trying to calm me down until I pushed him all the way out of the bathroom and I shut and locked the door.
>
> When I found the clothes I was wearing, I put them on. I remember shaking so bad I couldn't get them on and they were ripped. I looked for a way to get out and didn't see any other way out of the room except the door I just pushed him out of.
>
> . . . .

the first time that the victim impact statement does not qualify as a "victim impact statement" as that term is used in our Code because the statement was "not filed in advance alongside the presentence report but simply read aloud by the prosecutor at the hearing." See Tenn. Code Ann. §§ 40-38-205, -206. However, the Appellant did not object to the State's admitting the written statement into evidence and did not object to the State's reading the statement to the trial court. See Tenn. R. App. P. 36(b); State v. Gary Wayne Ford, No. E2019-00684-CCA-R3-CD, 2020 WL 4193711, at *10 (Tenn. Crim. App. at Knoxville, July 21, 2020).

When I opened that door my life never moved slower. I could hear and feel every single beat of my heart. I opened that door to see [the Appellant] sitting on the stairs waiting for me, smoking a cigarette, smiling. I was absolutely terrified. My survival instinct kicked in and I ran to the front door.

The door was locked. I was shaking so bad that I managed and unlocked it and ran out as fast as I could, scared to death, and terrified he would chase me and maybe kill me, to my house. I was screaming and crying and we called the police and they came and had an ambulance take me to the hospital from there.

The second question asked if the victim was injured, and she responded that she had "bruising on the backs of my arms and legs along with a giant and painful bruise that had covered the back of my neck and my head." She also said that "I had some patches of hair that had been ripped out of my head" and that "I also had a bump on my head and they said I had hit my head on something hard like a countertop."

The remaining questions related to the victim's medical treatment, any psychological and emotional injury she sustained, any counseling or therapy she received, the effect of the crime on her family, and her thoughts about the Appellant's sentence. The victim responded that immediately after she was released from the emergency room, she spent two weeks at Peninsula Mental Health Center. Two months after the incident, she began suffering from severe sleep deprivation, anxiety, and depression, and she attempted suicide. The victim said that she "kept replaying [the Appellant's] heavy body" on top of her and that she started blaming herself for the incident, which caused stress and "night terrors." The victim was diagnosed with severe post-traumatic stress disorder, major depression, anxiety, and a sleep disorder. She became suicidal and had to return to Peninsula for additional mental health treatment. The victim stated that prior to the Appellant's arrest, he harassed her brother at her brother's workplace and threatened to hurt her family. She said that her family members were afraid for their safety and that she was scared to leave her home at night. Regarding the Appellant's sentence, the victim said that she was disappointed the Appellant was not convicted "to the full extent of his crime" but that she did not favor imprisonment. In closing, the victim stated that the Appellant "seemed trustworthy" on the on the day of her "attack" and that she never had a friendship or relationship with him prior to that day.

According to the presentence report, the then twenty-five-year-old Appellant was single with no children.[2] The Appellant stated in the report that he dropped out of high school in the tenth grade but that he obtained his GED in 2013. He described his physical

---

[2] The Appellant was twenty-four years old at the time of the offense.

and mental health as good and reported that he consumed alcohol from the ages of twenty to twenty-four and that he smoked marijuana daily from the ages of nine to twenty-five. He denied use of any other illegal or nonprescribed drugs.

In the report, the Appellant stated that he had three siblings and eight half-siblings. The Appellant's parents divorced when he was one year old, and he lived with his father in Florida. When the Appellant was nine years old, his father went to prison, so the Appellant went to live with his mother in Tennessee. When the Appellant was twelve years old, he returned to Florida to live with his father. The Appellant's father died when the Appellant was fifteen, and the Appellant went back to Tennessee to live with his mother. The Appellant did not have a good relationship with his mother, so family friends adopted him when he was sixteen, and he returned to Florida to live with them. When the Appellant was twenty-two years old, he moved back to Tennessee to help one of his half-sisters, who was pregnant. The report showed that the Appellant worked for Traffic Man BBQ from June to September 2019, Griffin Car Wash from July 2018 to June 2019, and Cheddars from May 2018 to July 2018.

The presentence report showed no prior criminal history for the Appellant. His Strong-R assessment classified his overall risk to reoffend as moderate and concluded that he had high needs relevant to "Residential"; moderate needs relevant to "Family" and "Education"; and low needs relevant to "Friends," "Attitudes/Behaviors," "Aggression," "Mental Health," "Alcohol/Drug Use," and "Employment."

The evaluator for the Appellant's psychosexual risk assessment found him to be "cooperative, open, and genuine regarding the circumstances associated with his sexual acting out" and found his account of the crime to be consistent with that of the victim "with the exception of when the sexual behavior occurred and who initiated the sexual contact." Specifically, the Appellant claimed as follows: The victim went downstairs to the bathroom and called for the Appellant, and he went to her. She began kissing him, pulled him into the bathroom, and began touching his penis over his clothes. They took off their clothes and began having sex, and the victim passed out. The Appellant stopped having sex with the victim, tried to wake her, and splashed water on her face. The victim "got up and got dressed and left." The Appellant claimed that he did not know the victim was underage until he was arrested and that he thought it was okay to have sex with her because he thought she had feelings for him. The evaluator stated that the Appellant's credibility appeared "fair" and that the Appellant's thinking was "logical and coherent." The evaluator did not find any evidence of intellectual impairment or limitation but noted that the Appellant, who was in jail, described "some depression due to his present situation."

The Appellant's psychosexual risk assessment used various variables to determine his risk to reoffend. One of those variables was a Visual Assessment of Sexual Interest (VASI) in which "sophisticated eye gaze" was used to track the Appellant's visual

behaviors as he viewed collages of images.  The results of the Appellant's VASI were as follows:

> Mr. Killgo demonstrated deliberate attempts to avoid looking at the images of people.  He did not do this when he was looking at neutral images.  As a result, he demonstrated abnormally low interest to all people.  In looking at individual responses, Mr. Killgo demonstrated strongest fixation responses to females 6 to 17 years old.  Despite his attempt to avoid looking at persons, when he did look at the images of people, his interest was to females 6 [to] 17 years old.  Mr. Killgo's interest to adult females, his stated preference[,] is significantly below normal.  Lastly, Mr. Killgo demonstrated abnormal fixations off of images indicating deliberate attempts to avoid looking at images.  This is associated with attempts to hide their sexual interests from the examiner.  These results are associated with a **Moderate** level of risk associated with deviant interest.

Considering all of the variables, though, the evaluator concluded that the Appellant's level of risk to reoffend was low to moderate and recommended that he attend outpatient sex offender treatment.  The evaluator stated that the Appellant's amenability to benefit from treatment was high.

The State requested that the Appellant serve his sentence in confinement because the Appellant and the victim "had been using alcohol that evening and he preyed upon her.  This is a predatory type of situation."  The State asserted, "We understand that this is a statutory rape and not a rape, but as evident from her impact statement, she is traumatized by these events and has had significant psychological trauma from this."  The trial court commented as follows:

> I've read the Presentence Investigation Report.  I've read the psychosexual report.  I listened very carefully as you read the victim impact statement but, you know, would this case have gone to a jury on the question of whether or not a forceable rape occurred?  Of course it would have.  But am I now stuck here with the fact that he's pled to a crime -- because he's not acknowledging --
>
>      . . . .
>
> I mean, I'll say this for everybody in this room, and I'm not trying to make some sort of societal judgment here, because I don't think it's right, but it's just the reality, for whatever reason -- I was a prosecutor for 14 years and rape cases are incredibly difficult to prosecute.  I don't know why that is.  You know, if somebody immediately claims that they've been raped and there's physical evidence to back it up, you know, I don't know why people

would make up such an allegation. But that's not my place to judge that here today.

But I understand why the State did what it did. These are tough, tough cases to prosecute. But I'm still stuck with the fact that he's pled guilty to an E felony, in essence violating the age of consent. That's what he's pled to.

The State responded that the Appellant pled guilty to statutory rape and that "I'm not arguing that you should sentence him as a [forcible] rape." However, the State maintained that incarceration was appropriate for statutory rape in this particular case due to "the amount of trauma that he has caused this young lady." The State noted that the Strong-R assessment classified the Appellant as a moderate risk to reoffend and that the psychosexual evaluation recommended treatment. Therefore, the State also requested that the Appellant be placed on the sex offender registry.

Defense counsel stated that "I don't believe that we stipulated at any time that . . . this was an act by force." The trial court asked defense counsel if the stipulated facts "suggest[ed] this was something more than a statutory rape," noting that the victim immediately ran back to her home, made a "fresh complaint to others," participated in a sexual assault analysis, and cooperated with law enforcement. The trial court asked defense counsel if the court could consider those facts in sentencing. Defense counsel answered that the court could consider those facts in determining whether the Appellant should be placed on the sex offender registry but that the court could not consider those facts "outside . . . the statutory Class E felony." The trial court stated that the court did not think confinement in prison was a "viable option" but that "I'm trying to understand why he shouldn't be on the sex offender registry given these facts in this case." Defense counsel asserted that placing the Appellant on the registry "seems more punitive" and that the Appellant, who was not considered a high risk to reoffend and had a high amenability to benefit from treatment, could receive treatment and supervision on probation.

Defense counsel addressed each of the judicial diversion factors and argued that all of them weighed in favor of granting diversion. Defense counsel noted that the Appellant was amenable to correction per the psychosexual assessment, that the crime was "the lowest level felony we have in the State," that the Appellant did not have a criminal record, and that his physical and mental health were good. Regarding the Appellant's social history, defense counsel advised the trial court that the Appellant's mother was addicted to pills, that his step-father was abusive, and that the Appellant began taking care of three of his siblings so that they would not have to go into foster care. As to the deterrence value to the Appellant and others, defense counsel noted that the Appellant already had spent nine months in jail for the crime. Finally, defense counsel addressed whether judicial diversion would serve the interest of the public and the defendant and noted that the Appellant was still a young man and a first-time offender. The State argued that it was

- 9 -

concerned about the Appellant's amenability to correction because "when he's not candid it's hard to say that he is accepting full responsibility for what he's doing." The State also argued that the circumstances of the offense and the deterrence value to the Appellant and others weighed against granting diversion.

The Appellant gave an allocution in which he said that "I do take full responsibility for what happened that night" and that "I'm really sorry for [what] happened." The Appellant said that since the crime, he had realized what he needed to do in order to become a better person and that he would become a better person if "given the opportunity to be out there."

The trial court stated that "these cases are very, very difficult ones for a lot of different reasons" and that "I can understand why the State worked the agreement out the way it did in this case." The trial court said that "the facts that this Court has read in this record are much more consistent to me of some level or act of force was involved in this case than just merely being a statutory rape. That's what you've pled to and that's what you're going to be sentenced for." Nevertheless, the court stated that it could not "ignore the fact that the stipulated proof in this record is that immediately after this happened this young lady immediately complained to others that she had been sexually violated and then went through a sexual assault investigation and ultimately a police investigation, which led back to you." The trial court said that it thought it was "going to get reversed" if it sentenced the Appellant to prison and that it was not going to order split confinement because "you've been in [jail] for 265 days as of today." Therefore, the trial court ordered that the Appellant serve the balance of his six-year sentence on supervised probation.

As to judicial diversion, the trial court stated that it had considered all of the factors addressed by defense counsel that "a lot of those weigh in your favor." In particular, the trial court found that the Appellant's social history, his lack of a criminal record, and his amenability to correction weighed in favor of granting diversion. However, the trial court stated that "the circumstances of this offense trouble me, Mr. Killgo, and for that reason the Court is going to deny diversion. Likewise, you're going to be on the sex offender registry."

## II.  Analysis

The Appellant contends that the trial court erred by denying his request for judicial diversion because the court did not offer any "detailed discussion" regarding the diversion factors and did not explain why the circumstances of the offense outweighed the factors in favor of diversion. The Appellant also contends that the trial court erred by denying judicial diversion because the court's decision was based on its conclusion that the offense involved force when there was no stipulation to force at the plea hearing, the State did not offer any testimony or admissible evidence of force at the sentencing hearing, and the Appellant denied the use of force. Finally, the Appellant claims that the trial court erred

- 10 -

by ordering that he be placed on the sex offender registry because the court failed to provide any reasoned explanation for its decision and again relied on the use of force, which was not established by the State. The State argues that the trial court properly denied the Appellant's request for diversion and properly ordered that he be placed on the sex offender registry. We agree with the Appellant and conclude that the trial court erred.

Rape is unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by certain circumstances. Tenn. Code Ann. § 39-13-503. Count one of the presentment alleged rape by force, and count two alleged rape without the consent of the victim and the Appellant had reason to know the victim did not consent. See Tenn. Code Ann. § 39-13-503(a)(1), (2). The presentment later was amended to include a count of statutory rape to which the Appellant pled guilty. Relevant to this case, statutory rape is unlawful sexual penetration of a victim by a defendant when the victim is at least fifteen years old but less than eighteen years old and the defendant is more than five but less than ten years older than the victim. Tenn. Code Ann. § 39-13-506(b)(2). Rape is a Class B felony whereas statutory rape is a Class E felony. See Tenn. Code Ann. §§ 39-13-503(d)(2)(A). Furthermore, Tennessee Code Annotated section 39-13-506(d)(2)(B) provides as follows:

> In addition to the punishment provided for a person who commits statutory rape for the first time, the trial judge may order, after taking into account the facts and circumstances surrounding the offense, including the offense for which the person was originally charged and whether the conviction was the result of a plea bargain agreement, that the person be required to register as a sexual offender pursuant to title 40, chapter 39, part 2.

Pursuant to Tennessee Code Annotated section 40-35-313(a)(1)(B)(i)(a)-(e), a defendant is eligible for judicial diversion when he or she is found guilty or pleads guilty or nolo contendere to a Class C, D, or E felony; is not seeking deferral for an offense committed by an elected official; is not seeking deferral for a sexual offense; has not been convicted of a felony or a Class A misdemeanor previously and served a sentence of confinement; and has not been granted judicial diversion or pretrial diversion previously. Statutory rape is not classified as a sexual offense for purposes of judicial diversion. See Tenn. Code Ann. § 40-35-313(a)(1)(B)(ii). Additionally, in determining whether to grant a defendant judicial diversion, the trial court must consider all of the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the status of the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the interest of the public as well as the defendant. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)).

The record must reflect that the trial court has taken all of the factors into consideration, and "we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision." Id. Furthermore, "[t]he court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." Id. When reviewing a trial court's decision to grant or deny judicial diversion, the standard of review is abuse of discretion with a presumption of reasonableness. State v. King, 432 S.W.3d 316, 327 (Tenn. 2014). However, if the trial court failed to weigh and consider the relevant factors, this court may conduct a de novo review or remand the case for reconsideration. Id. at 328. This court has analyzed the standard of review for a trial court's decision whether to order a defendant to register as a sex offender pursuant to Tennessee Code Annotated section 39-13-506(d)(2)(B) and has concluded that the same standard, abuse of discretion with a presumption of reasonableness, applies. State v. Ryan Patrick Broadrick, No. M2017-01136-CCA-R3-CD, 2018 WL 4203883, at *5-7 (Tenn. Crim. App. at Nashville, Sept. 4, 2018); see State v. Scott A. Brown, No. M2019-00988-CCA-R3-CD, 2020 WL 5509750, at *3 (Tenn. Crim. App. at Nashville, Sept. 14, 2020); State v. Quantorius Rankins, No. M2019-00687-CCA-R3-CD, 2020 WL 5204229, at *6 (Tenn. Crim. App. at Nashville, Sept. 1, 2020); State v. Presley William Nave, Jr., No. M2018-02085-CCA-R3-CD, 2020 WL 774347, at *6 (Tenn. Crim. App. at Nashville, Feb. 18, 2020), perm. app. denied, (Tenn. June 3, 2020) (all relying on Ryan Patrick Broadrick).

Turning to the instant case, the trial court did not specifically address all of the Parker and Electroplating factors in denying the Appellant's request for judicial diversion. However, defense counsel addressed each of the factors, and the trial court stated, "I've considered all the related factors that are laid out that your lawyer went through." The trial court found that at least three of the seven factors weighed in favor of diversion but that the circumstances of the offense justified denying diversion. Therefore, the trial court's ruling is entitled to a presumption of correctness.

We note that the circumstances of an offense alone may support a denial of judicial diversion. State v. Kyte, 874 S.W.2d 631, 634 (Tenn. Crim. App. 1993). What troubles this court is how the trial court reached that conclusion.

At the plea hearing, the prosecutor advised the trial court that "each side has a number of favorable and unfavorable facts making a settlement short of trial acceptable to both parties." In other words, the prosecutor thought it was in the State's best interest for the Appellant to plead guilty to statutory rape rather than the State pursue a trial for rape involving force or lack of consent. After the prosecutor gave the factual account of the crime, the trial court agreed with that assessment, calling the plea agreement "wise." At the sentencing hearing, though, the trial court determined that the Appellant penetrated the victim by force and that the State would have pursued a conviction for forcible rape if the case had gone to trial. The trial court apparently inferred force solely from the victim

- 12 -

impact statement because the victim "immediately claimed to others that she had been sexually violated and then went through a sexual assault investigation."

We note that in deciding whether to deny judicial diversion, a trial court can consider a victim impact statement as it reflects on the circumstances of the offense. State v. Dennis Miller, No. M2016-02302-CCA-R3-CD, 2017 WL 4582047, at *4 (Tenn. Crim. App. at Nashville, Oct. 13, 2017) (citing State v. Blackhurst, 70 S.W.3d 88, 95 (Tenn. Crim. App. 2001), in which this court noted that a trial court can consider relevant and reliable evidence in a victim impact statement related to the circumstances surrounding the offense and any other sentencing consideration). Here, the victim said in her impact statement that the Appellant went to hug her, that she remembered the Appellant's being on top of her, that she was in and out of consciousness, and that she awoke "choking on water." That account was not inconsistent with the prosecution's recitation of the stipulated facts at the plea hearing, which included that the victim remembered the Appellant asking her if she knew what she was doing, if she was okay, and if she wanted him to stop, and it was not inconsistent with the Appellant's claim in his psychosexual assessment that the victim passed out while they were having sex, that he stopped having sex with her, and that he splashed water on her face to wake her. According to the stipulated facts, the victim ran back to her home, "reported to her friends what had happened," and was "extremely upset." Similarly, the victim said in her impact statement that she ran home "screaming and crying" and that "we called the police." There is no evidence in the record that she ran home and told others she had been forcefully penetrated or "sexually violated."

The record demonstrates that the parties went to great lengths to negotiate a plea agreement that did not include a stipulation to force, and the State even argued at sentencing that the trauma the victim experienced, not force, justified denying diversion based on the circumstances of the offense. Therefore, we conclude that the trial court erred by inferring solely from the victim impact statement that the circumstances of the offense involved force. Given that the trial court denied judicial diversion based on the circumstances of the offense and did not explain why any of the other factors weighed against granting judicial diversion, we also conclude that the trial court erred by denying diversion.

After the trial court explained its reason for denying judicial diversion, the court immediately stated that "[l]ikewise, you're going to be on the sex offender registry," demonstrating that it applied the same rationale for ordering the Appellant's placement on the registry. Thus, we reverse that ruling as well. We conclude that the case should be remanded in order for the trial court to reconsider the Appellant's request for judicial diversion and whether he should be placed on sex offender registry.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we reverse the trial court's denial of judicial diversion and the court's order that the Appellant be placed on the sex offender registry and remand the case for further proceedings consistent with this opinion.

_____
NORMA MCGEE OGLE, JUDGE